COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

ROBERTO PENA,                                               )

                                                                              )               No.  08-02-00361-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )                 
41st District Court

THE STATE OF TEXAS,                                     )

                                                                              )           
of El Paso County, Texas

Appellee.                           )

                                                                              )               
(TC# 20010D03736)

                                                                              )

 

 

O P I N I O N

 








Appellant Roberto
Pena was indicted with two counts of intoxication manslaughter and two counts
of failure to stop and render aid. 
Before a jury, Appellant pled guilty to all four counts, but pled Anot true@
to the allegation that he used or exhibited a deadly weapon during the
commission of the offense as alleged in each count.  The jury found Appellant guilty of all four
counts and made an affirmative finding on the use of a deadly weapon for each
count.  The jury assessed punishment at
twenty years=
imprisonment and a $10,000 fine for each intoxication manslaughter count and
five years=
imprisonment and a $5,000 fine for each failure to stop and render aid
count.  Upon the State=s motion, the trial court ordered that
the intoxication manslaughter counts be served consecutively, with the failure
to stop and render aid counts to be served concurrently.  The trial court sentenced Appellant in
accordance with the jury=s
assessment, however we observe the court=s final judgments and sentences only
contain deadly weapon findings for the intoxication manslaughter offenses.  In his sole issue on appeal, Appellant
contends the trial court committed reversible error by admitting testimony from
a State=s witness
concerning the speed his vehicle was traveling when it struck the victims= vehicle and that this testimony
severely prejudiced him.    We affirm.

On June 17, 2001,
between 12:30 and 1 a.m., Zachary Valenzuela was driving in the center lane on
Gateway West when he noticed headlights in his rear view mirror.  The rate of speed at which the car was coming
at him from behind was the reason the headlights caught his attention.  Mr. Valenzuela was driving between 55 to 60
miles per hour.  He considered changing
lane, but at the rate of speed the vehicle was approaching, he decided to stay
in the center lane.  When the approaching
vehicle pulled up behind Mr. Valenzuela, it switched lanes, Aflew by him,@
and pulled back into the center lane. 
Mr. Valenzuela recalled that the vehicle approached him from behind at a
constant speed and was easily going over 60 miles per hour because it quickly
passed him.  As it passed, Mr. Valenzuela
observed that the vehicle was a green Corvette driven by a male driver, later
identified as Appellant.








As the Corvette
traveled ahead to the Lee Trevino intersection, Mr. Valenzuela kept the vehicle=s taillights in his line of sight and
recalled there was nothing between him and the Corvette.  Mr. Valenzuela saw cars stopped at the lights
ahead.  He then saw the Corvette=s taillights swerve to one side and for
a split second, saw car headlights turn quickly facing
his direction before they turned.  Mr.
Valenzuela hit his brakes when he saw the headlights because he knew he was
traveling on a one-way street.  He knew
there had been an accident, but did not see the actual impact.  Mr. Valenzuela recalled that the Corvette=s brake lights did not go on before the
accident.

Veronica Huerta
Garcia was at the Lee Trevino and Gateway West intersection at the time of the
accident.  Ms. Garcia was in the middle
lane behind a green Eclipse and in front of a black Pontiac, waiting for the
light to change.  All the cars waiting
for the light were in the middle lane. 
When the light turned green, Ms. Garcia drove a little bit forward and
then heard a loud impact of vehicles being struck behind her.  She looked at her rearview  mirror and saw a car, a Honda CRX pop
up, go airborne, and then land with its headlights facing the opposite
direction.  To her left, Ms. Garcia saw a
green Corvette slam against the guardrail, causing sparks to fly.  She noticed that the Corvette hit the
guardrail at a high rate of speed and then came to a sudden stop.  When Ms. Garcia saw everything right
behind her, she quickly swerved to the right to avoid being hit in the chain
reaction.  She then called 911 on her
cell phone.

Within seconds,
Ms. Garcia checked on some of the cars involved in the accident.  The Corvette was damaged in the front of the
hood and on the side that hit the guardrail. 
Ms. Garcia had contact with the driver, Appellant, and recalled that he
was drunk and smelled strongly of alcohol. 
She helped Appellant exit the Corvette, before going to assist the
injured passenger and driver of the Honda CRX.

Robert Herrera,
his wife, and their two children, were also at the Lee Trevino-Gateway West
intersection at the time of the accident. 
Mr. Herrera recalled there was one car in front
of him and two cars behind him.  While he
was waiting in the center lane for the light to change, Mr. Herrera heard a
loud crash and felt the impact.  Right
after the accident, Mr. Herrera went straight to the Corvette and observed Appellant trying to get out of the vehicle.  Mr. Herrera was yelling at Appellant and
tried to take off the car window before his wife called him away.  








Miguel Garcia, Jr.
and his spouse were traveling home from Horizon City on Interstate-10 and
exited at Lee Trevino.  Mr. Garcia
recalled that it was a nice evening with no inclement weather.  As he exited, he saw that an accident had
just occurred right in front of the Shamaley Ford
dealership, a very well lit area.  Mr.
Garcia saw a Honda Civic turned around facing oncoming traffic, a Corvette to
his left, and some other cars in front. 
As he approached the scene, he veered off to the Shamaley
Ford entranceway toward Gateway West. 
Mr. Garcia got out of his car and went over to assist the passengers in
the Honda Civic.  Mr. Garcia then
approached the Corvette and made contact with Appellant.  He observed that Appellant was talking on a
cell phone in Spanish, smelled of alcohol, and was very
disoriented.  Mr. Garcia recalled
Appellant telling him to go to the other guys because they looked pretty
bad.  Mr. Garcia then left Appellant and
later noticed that he had fled the scene. 


Ronald Drake, a
security guard for Shamaley Ford on duty at the time
of the accident, observed a man running through the dealership=s parking lot.  As the man ran, he was bouncing off the cars,
stumbling, and fell twice.  Mr. Drake saw
the man drop his cell phone twice as he ran. 
As he started to approach the individual who had stumbled and fallen
down, Mr. Drake smelled a lot of alcohol and backed off.  The man ran across the back lot and then
headed east on Rojas.  Mr. Drake then
observed the fire department, an ambulance, and police coming down Lee Trevino
and traveling on Gateway West the wrong way. 
Mr. Drake went to the accident scene and informed the police about the
man running through the parking lot.  








El Paso Police
Officer Steve Smith was dispatched to the multi-car accident scene at
approximately 12:35 a.m.  Officer Smith
recalled that it was a clear night, the roadway was dry, and the location was
well-lit by the Shamaley Ford dealership.  From his preliminary investigation, he
determined that the green Corvette had traveled westbound on Gateway West in
the center lane and had struck the Honda vehicle in front of it, which then
struck the vehicle in front of it, which in turn struck another vehicle in
front of that one.  Of the four vehicles
involved in the accident, three were facing west and one, the Honda vehicle,
was facing eastbound as it had spun around due to the impact.  Officer Smith observed extensive damage to
the rear of the Honda vehicle.

The most
critically injured in the accident were the two occupants of the Honda vehicle
first struck by the Corvette.  The front
passenger, Mario Sandoval, was not breathing and was pronounced dead at the
scene.  Dr. Juan Contin,
the county medical examiner, determined that Mario Sandoval bled to death from
a torn aorta in the chest, which resulted from the collision.  After the accident, the driver, Roberto
Sandoval, was not conscious and had a very faint pulse.  Mr. Sandoval was taken to the hospital, but
died the following day from massive brain injuries sustained in the accident.

Around 2:12 a.m.,
police officers apprehended Appellant as he stumbled towards his house on Tony Tejeda.  Appellant
was arrested and taken to the accident scene where he was identified by
witnesses as the individual driving the Corvette.  Appellant was later taken to Del Sol Medical
Center where his blood was drawn.  The
blood test results showed Appellant had a blood-alcohol level of .23.








Ruben Cisneros, an
El Paso police officer assigned to the special traffic investigations section,
testified that based on his accident reconstruction analysis, he found no
pre-impact brake marks nor any pre-impact skid marks for the Corvette.  Officer Cisneros observed extensive front end
damage to the Corvette, extensive rear damage to the Honda, and paint transfer
from the Honda to the Corvette.  Based on
his observations and the skid marks, Officer Cisneros determined the front end
of the Corvette collided with the back end of the Honda Civic CRX.  After the initial impact, the rear end of the
Honda Aclimbed
up@ on the front end of the Corvette,
causing the vehicle to spin clockwise 80 degrees and go airborne before coming
to a stop.  When the Corvette struck the
Honda, its left front tire locked up due to front end damage.  The Corvette then veered to the left lane and
collided with the guardrail, leaving a post-impact skid mark from the left
front tire.  

At trial,
Appellant objected to Officer Cisneros=
testimony as an expert witness concerning the speed of the vehicles involved in
the accident.  Over Appellant=s objection, Officer Cisneros testified
that based on his accident reconstruction formula calculations, he determined
the initial impacting vehicle, the Corvette, was traveling 104 miles per
hour.  He also determined the Honda was
impacted from zero speed to a post-impact speed of 28 miles per hour.

Expert
Testimony

In his sole issue
for review, Appellant argues the trial court committed reversible error by
admitting Officer Cisneros=
testimony concerning the speed his vehicle was traveling on June 17, 2001 and
that this testimony severely prejudiced him. 
Specifically, Appellant contends the State did not meet its burden in
establishing that Officer Cisneros was qualified as an expert
witness nor did it present evidence concerning the reliability of the AAIMS test@
used to establish the speed his vehicle was traveling when it struck the Honda
CRX.

Standard
of Review and Applicable Law








A trial court=s ruling to admit or exclude evidence
is reviewed under an abuse of discretion standard.  Montgomery v. State, 810 S.W.2d 372,
391 (Tex.Crim.App. 1991)(Op.
on reh=g).  Absent a clear abuse of discretion, a trial
court=s
decision to admit or exclude expert testimony will not be disturbed.  Wyatt v. State, 23
S.W.3d 18, 27 (Tex.Crim.App. 2000); Morales v.
State, 32 S.W.3d 862, 865 (Tex.Crim.App. 2000).  An abuse of discretion exists when the trial
court=s
decision was so clearly wrong as to lie outside the zone of reasonable
disagreement, in other words, the trial court=s
decision or action was arbitrary, unreasonable, and made without reference to
any guiding rules or principles.  See
Montgomery, 810 S.W.2d at 391.

For a witness=s expert testimony to be admissible,
the witness must be qualified as an expert by Aknowledge,
skill, experience, training, or education . . . .@  Tex.R.Evid. 702.  Rule 702 provides: 

If scientific, technical, or other
specialized knowledge will assist the trier of fact
to understand the evidence or to determine a fact in issue, a witness qualified
as an expert by knowledge, skill, experience, training, or education may
testify thereto in the form of an opinion or otherwise.

 

Tex.R.Evid. 702.

 

The party offering
the evidence has the burden of showing the witness is qualified as an expert on
the specific matter in question.  Penry v. State, 903 S.W.2d 715, 762 (Tex.Crim.App. 1995), cert. denied, 516 U.S. 977, 116
S.Ct. 480, 133 L.Ed.2d 408 (1995).  

Pursuant to
Kelly v. State, 824 S.W.2d 568 (Tex.Crim.App.
1992), the proponent of expert testimony or evidence based on a scientific
theory must show by clear and convincing evidence that the evidence is:  (1) reliable and (2) relevant to assist the trier of fact in its 








fact-finding
duty.  Id. at
572; Ochoa v. State, 994 S.W.2d 283, 284 (Tex.App.--El
Paso 1999, no pet.).  To be
reliable, the proffered evidence must satisfy three criteria:  (1) the underlying scientific theory must be
valid; (2) the technique applying the theory must be valid; and (3) the
technique must have been properly applied on the occasion in question.  Kelly, 824 S.W.2d at
573.  The trial court=s determination of reliability could be
affected by the following 

non-exclusive factors:  (1) the extent to which the underlying
scientific theory and technique are accepted as valid by the relevant
scientific community, if such a community can be ascertained; (2) the
qualifications of the expert(s) testifying; (3) the existence of literature
supporting or rejecting the underlying scientific theory and technique; (4) the
potential rate of error of the technique; (5) the availability of other experts
to test and evaluate the technique; (6) the clarity with which the underlying
scientific theory and technique can be explained to the court; and (7) the
experience and skill of the person(s) who applied the technique on the occasion
in question.  Id.

Daubert/Kelly Hearing

At trial,
Appellant objected to Officer Cisneros=
testimony as an expert witness concerning the speed of the vehicles involved in
the accident.  Outside the jury=s presence, Officer Cisneros testified
that on many occasions, he has done speed reconstruction.  He has had a variety of training courses in
speed reconstruction, specifically the basic accident investigation course
offered by the police department, the intermediate accident investigation
course, the advanced accident reconstruction course, and the traffic accident
reconstruction course.  In 1997, Officer
Cisneros received approximately 80 hours in accident reconstruction training in
San Antonio at the Bexar County Sheriff=s
Department.  He also has had training in
bicycle, pedestrian, and motor vehicle collisions.  In August 1999, Officer Cisneros was
certified in the 383rd District Court as an expert and again in October 2001 in
the 41st District Court.  








In this particular
case, Officer Cisneros determined the speed of the Corvette and other vehicles
by using formulas he had been taught to use for specific types of
collisions.  Officer Cisneros inserted
certain data that was obtained from the scene into these formulas to derive the
speeds.  Officer Cisneros explained that
he worked the calculations out by hand using a calculator and used a skid speed
formula for the post-impact distances and then used a linear momentum in-line
collision formula to determine a speed for the Chevrolet Corvette.  Based on these findings and his training,
experience, and knowledge, Officer Cisneros determined the Corvette was
traveling roughly 104 miles per hour at impact. 
The trial court overruled Appellant=s
objection to Officer Cisneros=
testimony, but allowed Appellant=s
counsel to further voir dire Officer Cisneros outside
the jury=s
presence.  








In voir dire, Officer Cisneros testified that the measurements
used in calculating the skid speed and linear momentum in-line collision
formulas were taken with a surveying instrument called an Accident
Investigation Measuring System (AAIMS@). 
Officer Cisneros explained that operation of the AIMS device consists of
setting up the equipment and from that initial point, taking shots by aiming
the equipment at the particular target you want.  The device has a prism that shoots a laser
beam to the prism at the target, which shoots it back and gives you the
measurement.  Officer Cisneros conceded
that he could not explain in any detail the scientific principles involved in
this type of measuring system.  Officer
Cisneros stated that his department has two AIMS equipment, which were recently
checked for calibration by the manufacturer, but he did not know the last time
the AIMS device he used was calibrated. 
Officer Cisneros also conceded that he did not know whether or not the
accuracy of AIMS results could be validated over and over again by someone who
is an expert in the underlying scientific principles of this measuring
machine.  

Regarding the
formulas used in his calculations, Officer Cisneros testified that he obtained
the measurements used in the formulas by using the AIMS machine.  The formulas were taught to him during the
courses mentioned above.  Officer
Cisneros explained that the formulas are used internationally by other law
enforcement agencies, including the Department of Public Safety in Texas.  Officer Cisneros, however, conceded that he
did not know who devised the formulas and did not know the scientific
principles underlying the values in the formulas.  

At the conclusion
of the hearing, Appellant=s
counsel renewed his objection to Officer Cisneros=
testimony.  In response, the State argued
that the AIMS system and formulas have been judicially accepted and noted that
the officer testified that the AIMS system is used by other departments.  It further noted that there have been no
problems with it when used before.  The
trial court overruled Appellant=s
objection and allowed the State to offer the officer=s
expert witness concerning the speed of the Corvette and that of the other
vehicle at the time of the collision.  

Qualifications

As the party
offering Officer Cisneros=
testimony, the State had the burden of showing he qualified as an expert on
speed based on his accident reconstruction background.  See Penry, 903 S.W.2d at 762. 
Police officers are qualified to testify regarding accident reconstruction
if they are trained in the science about which they will testify and possess a
high degree of knowledge sufficient to qualify as an expert.  DeLarue v. State, 102 S.W.3d 388, 396 (Tex.App.--Houston
[14th Dist.] 2003, no pet.).








Here, Officer
Cisneros testified that he has been a police officer with the El Paso Police
Department for twenty years.  Since April
1994, he has been assigned to the special traffic investigations section.  Officer Cisneros has received basic,
intermediate, and advanced training in accident reconstruction, including speed
reconstruction.  In addition, Officer
Cisneros has eighty hours of accident reconstruction training held at the Bexar
County Sheriff=s
Department in 1997.  On many occasions he
has done accident reconstruction for the special traffic investigations
section.  Officer Cisneros has been
certified twice as an expert in accident reconstruction by El Paso
district courts.  For this case, Officer
Cisneros was called out to Gateway West on June 17, 2001 and performed an
accident reconstruction of the incident. 
Officer Cisneros clearly demonstrated he had special knowledge on
accident reconstruction, including speed reconstruction, based on his extensive
training and his field experience. 
Therefore, we conclude the trial court did not abuse its discretion in
determining Officer Cisneros was qualified to offer his expert opinion in speed
reconstruction.  

Reliability

The State in this
case does not dispute that accident reconstruction, specifically Officer
Cisneros=
testimony concerning the speed at which Appellant was driving at the time of
impact, is a type of scientific evidence subject to Kelly requirements
for admissibility.  By clear and
convincing evidence, the State was required to show that with respect to the
scientific evidence in this case:  (1)
the underlying scientific theory was valid; (2) the technique applying the
theory was valid; and (3) the technique was properly applied on the occasion in
question.[1]  See Kelly, 824
S.W.2d at 573.








Appellant argues
on appeal that the State presented no evidence concerning the reliability of
the AAIMS
test.@  By Appellant=s
complaint we understand him to be challenging the reliability of AIMS
equipment-derived distance measurements and the reliability of the speed
calculation formulas used by Officer Cisneros in his speed reconstruction
analysis.

Here, Officer
Cisneros testified that the formulas he used in deriving Appellant=s driving speed are also used by other
law enforcement agencies.  Officer
Cisneros, however, conceded that he did not know the scientific principles
underlying the values in the formulas used to derive Appellant=s speed at the time of impact.  He could not explain the underlying
scientific principles of how the AIMS equipment provided distance measurements
and he did not know whether or not the accuracy of AIMS results could be
validated over and over again.  In this
case, there is no evidence in the record sufficient to satisfy the reliability
requirements pursuant to Kelly. 
Therefore, the trial court erred in admitting the evidence concerning
Appellant=s driving
speed.  We find, however, that in this
case, admission of Officer Cisneros=
testimony concerning Appellant=s
driving speed at the time of impact was harmless.  

A nonconstitutional error that does not affect the
substantial rights of the defendant must be disregarded.  See Tex.R.App.P. 44.2(b).  A substantial right is affected when the
error had a substantial and injurious effect or influence in determining the
jury=s
verdict.  King v.
State, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997).  A criminal conviction should not be
overturned for nonconstitutional error if the
appellate court, after examining the record as a whole, has fair assurance that
the error did not influence the jury or had but a slight effect.  Johnson v. State,
967 S.W.2d 410, 417 (Tex.Crim.App. 1998). 








In this case,
Appellant pled guilty and was convicted of intoxication manslaughter.[2]  A person commits the offense of intoxication
manslaughter if the person:  (1) operates
a motor vehicle in a public place; (2) is intoxicated; and (3) by reason of
that intoxication causes the death of another by accident or mistake.  See Tex.Pen.Code Ann. '
49.08(a)(Vernon 2003). 
The contested issue at trial was whether Appellant used or exhibited a
deadly weapon:  to wit a motor vehicle in
commission of the offense.  A deadly
weapon is defined as Aanything
that in the manner of its use or intended use is capable of causing death or
serious bodily injury.@  Tex.Pen.Code
Ann. ' 1.07(a)(17)(B)(Vernon 2003). 
Anything, including a motor vehicle, which is actually used to cause the
death of a human being is a deadly weapon.  Tyra v. State, 897 S.W.2d 796, 798 (Tex.Crim.App.
1995).  This is necessarily so
because a thing which actually causes death is, by definition, Acapable of causing death.@ 
Id.








The evidence shows
that Appellant was driving in excess of 60 miles per hour as he passed Zachary
Valenzuela and approached the Lee Trevino-Gateway West intersection.  Mr. Valenzuela did not see Appellant
attempt to brake prior to the accident and witnesses testified that the
intersection was well-lit and the roadway was dry.  Physical evidence and witness testimony
indicated that the front of Appellant=s
vehicle collided with the rear end of the victims= vehicle, causing their vehicle to go
airborne and spin around to face oncoming traffic.  Through her rearview mirror, Veronica Huerta
Garcia saw Appellant=s
vehicle slam against the guardrail at a high speed, causing sparks to fly.  In unchallenged testimony, Officer Cisneros
testified that he found no pre-impact brake marks and no pre-impact skid marks
at the accident scene.  El Paso County
Medical Examiner Dr. Juan Contin testified that the
passenger victim bled to death from a torn aorta, resulting from the
collision.  Dr. Contin
also testified that the driver victim died the following day in the hospital
from injuries sustained in the collision. 


After examining
the record as a whole, we find the evidence above was sufficient to support the
jury=s
affirmative finding that Appellant used his motor vehicle in a manner that was
capable of causing death or serious bodily injury, without considering the
speed evidence introduced through Officer Cisneros=
testimony.  The trial court=s erroneous admission of the speed
evidence did not affect Appellant=s
substantial rights and in light of other properly admitted evidence we are
assured that if its admission influenced the jury at all, it did so only
slightly.  Therefore, we find the trial
court=s error
to be harmless.  Issue One is overruled.

 Accordingly, we affirm the trial court=s judgment.

 

January 29, 2004

DAVID WELLINGTON CHEW, Justice

 

Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.

McClure, J., Concurring

 

(Publish)








 

C
O N C U R R I N G  
O P I N I O N

 

 

The record shows
that Appellant waived his complaint about the AIMS device and the measurements
derived from it.  Therefore, I disagree
with the majority=s
conclusion that the trial court abused its discretion by admitting this
particularly testimony.  Alternatively, I
would find that the State is not required to prove the scientific principles
pertaining to the AIMS device in order for an expert to rely on measurements
taken with the device.  While I agree
with the majority=s holding
that the State failed to carry its burden under Kelly with respect to
Cisneros= expert
opinion as to the pre-impact speed of Appellant=s
vehicle, I write separately to discuss the effect of Hernandez v. State,
116 S.W.3d 26 (Tex.Crim.App. 2003) on an appellate
court=s review
of this issue.  Because the majority
opinion ultimately concludes that the errors in admitting the
expert testimony is harmless, I concur.

Cisneros utilized
two formulas in estimating the speed at which Appellant=s
car was traveling at the time of impact: 
the skid speed formula and the linear momentum in-line collision
formula.  These formulas are used not
only by the Texas Department of Public Safety but also internationally by other
law enforcement agencies and they were taught to Cisneros at the accident
investigation and accident reconstruction courses he attended as part of his
training.  Pursuant to his training, Cisneros
gathered data relevant to the following formula components:

1.                 
weight of the vehicles;

2.                 
the coefficient of friction or drag factor; and

3.                 
the post-impact distances of
the vehicles.  








Cisneros obtained
the weight of the vehicles involved in the accident from the Department of
Motor Vehicles.  The drag factor pertains
to the friction of the roadway and Cisneros obtained this figure by utilizing a
drag sled to find a coefficient of friction for the particular road involved in
the accident.  For the third factor,
Cisneros utilized the AIMS device to measure the distances traveled by the two
vehicles after impact.  A diagram
prepared by Cisneros (State=s
Exhibit 10) shows that Appellant=s
vehicle traveled 413 feet from the point of impact to its resting place.  There were no pre-impact skid marks because
Appellant=s vehicle
did not skid prior to striking the complainants=
car.  Consequently, Cisneros utilized the
skid speed formula to determine only a post-impact speed for each vehicle
involved in the accident.  

As explained by
Cisneros, the skid speed formula involves multiplying distance by a constant of
thirty by the square root of the roadway drag factor.  Cisneros determined that the complainants= Honda went from 0 miles per hour to a
post-impact speed of 28 miles per hour. 
Cisneros was not asked to state the post-impact speed he determined for
the Corvette but he included the figure in a written expert=s report filed in the case.[1]  With the post-impact speeds determined by the
skid speed formula, Cisneros then applied the weights of the vehicles in the
linear momentum in-line collision formula in order to obtain the speed of the
initial impacting vehicle.  Based on this
formula, Cisneros estimated that Appellant=s
Corvette was traveling 104 miles per hour at the point of impact.  Cisneros explained the components of the skid
speed formula but was not asked to explain the linear momentum in-line
collision formula.

Waiver of Complaint About
Measurements








The majority has
failed to consider that Appellant waived any complaint about Cisneros= use of the AIMS device to obtain the
measurements used in the speed calculation formulas because Appellant did not
object to State=s Exhibit
10, which is a diagram of the collision including measurements taken at the
scene with the AIMS device.  It is well
established that a party must make a timely and specific objection in order to
preserve his complaints for appellate review. 
See Tex.R.App.P. 33.1.  Further, a party must object every
time inadmissible evidence is offered or the complaint is waived.  See Ethington
v. State, 819 S.W.2d 854, 858 (Tex.Crim.App.
1991); Gillum v. State, 888 S.W.2d 281,
285 (Tex.App.‑-El Paso 1994, pet. ref=d).  In the presence of the jury, the State
elicited testimony from Cisneros showing that he had training in accident
reconstruction and had previously testified as an expert on that topic.  Cisneros then identified State=s Exhibit 10 as a diagram of the accident
which he prepared on the night of the accident. 
Cisneros explained that he used the Accident Investigation Measuring
System (AIMS), which he described as a surveying device, and a software program
to prepare State=s Exhibit
10.  The State then offered State=s Exhibit 10 and Appellant=s counsel stated that he had no
objection to it.  State=s Exhibit 10 depicts the point of
impact and post-impact locations of the vehicles, their direction of travel,
the location of various skid marks, and measurements of those skid marks taken
by Cisneros using AIMS.  The exhibit
reflects that Appellant=s
Corvette traveled 413 feet from the point of impact with the complainants= Honda. 
By failing to object to the initial testimony about the AIMS device and
State=s Exhibit
10, Appellant waived any subsequent complaint he might have had about the
measurements taken by Cisneros with the assistance of the AIMS device.

Scientific Validity of AIMS








Even if Appellant
did not waive his complaint about the measurements and the AIMS device, the
majority opinion errs by holding that the State was obligated to establish that
Cisneros understands the inner-workings of this surveying device.  Cisneros was offered as an expert in accident
reconstruction, not as an expert in AIMS equipment.  Consequently, there was no necessity for the
State to prove that he understood exactly how laser measuring devices and
surveying equipment work.  As aptly noted
by appellate counsel for the State, the AIMS device is essentially a high-tech
tape measure and Cisneros used the device to measure the distance between two
points.  I find no requirement in Rule
703 or elsewhere that an expert witness be able to explain the scientific
principles involved in every piece of equipment used by the expert to gather
data.  To illustrate this point, an
expert who relies on photographs as part of the foundation for his opinion
regarding the cause of an accident need not explain precisely how a camera
works in order to rely on the data supplied by the photographs.  Likewise, an expert witness who utilizes a
calculator in performing calculations is not required to relate to the jury the
scientific principles involved in an electronic calculator before his expert
testimony is permitted.  Cisneros
sufficiently explained that the AIMS device, using a laser, measured the
distance Appellant=s car
traveled from the point of impact to its resting place and he utilized that
measurement in the skid speed formula. 
For these reasons, I would find that the trial court did not abuse its
discretion in admitting Cisneros=
testimony about the measurements taken at the scene of the accident.

Reliability of the Speed Calculation Formulas








While I would find
much of Cisneros=
testimony admissible, the State failed to offer sufficient evidence proving the
reliability of the two formulas utilized by Cisneros to estimate speed.  A party seeking to
introduce evidence of a scientific principle need not always present
expert testimony, treatises, or other scientific material to satisfy the Kelly
test.  Hernandez, 116 S.W.3d at 28-9. 
It is only at the dawn of judicial consideration of a particular type of
forensic scientific evidence that trial courts must conduct full-blown Agatekeeping@ hearings under Kelly. Id. at 29. 
Once a scientific principle is generally accepted in the pertinent
professional community and has been accepted in a sufficient number of trial
courts through adversarial Daubert/Kelly[2]
hearings, courts subsequently considering the issue may take judicial notice of
the scientific validity (or invalidity) of that scientific theory based upon
the process, materials, and evidence produced in the prior hearings.  Id. at 29; see Weatherred
v. State, 15 S.W.3d 540, 542 n.4 (Tex.Crim.App.
2000)(Aonce a
particular type of scientific evidence is well established as reliable, a court
may take judicial notice of that fact, thereby relieving the proponent of the
burden of producing evidence on that question@).  In other words, trial courts are not required
to reinvent the scientific wheel in every trial.  Hernandez, 116
S.W.3d at 29.  The Court of
Criminal Appeals has recently emphasized, however, that some trial courts must
conduct an adversarial gatekeeping hearing to
determine the reliability of the given scientific theory and its methodology
before other trial courts may take judicial notice of that determination.  Id. 
Although appellate courts may likewise take judicial notice of other
appellate opinions concerning a specific scientific theory or methodology in
evaluating a trial court=s
Daubert/Kelly gatekeeping
decision, judicial notice on appeal cannot serve as the sole source of support
for a bare trial court record concerning scientific reliability.  Hernandez, 116
S.W.3d at 31-2.








Although the trial
court held a Daubert/Kelly hearing in
the instant case, the State did not offer any evidence of the theories
underlying the formulas utilized by Cisneros. 
Further, the State 
did not show that the issue of the formulas= reliability has been litigated
previously nor did it ask the trial court to take judicial notice of the
reliability of the scientific theory and methodology based upon prior hearings
or prior appellate decisions.  See
Hernandez, 116 S.W.3d at 30 and n.7. 
There is evidence that Cisneros has previously qualified as an expert
and testified regarding accident reconstruction and perhaps even speed
estimation, but the fact that a trial court has allowed some type of scientific
testimony by a particular witness previously does not mean that the witness=s testimony is, ipso facto,
scientifically reliable.  Hernandez,
116 S.W.3d at 30.

The trial court=s decision to admit this evidence is
understandable as expert testimony regarding accident reconstruction and speed
estimation has been previously admitted in Texas civil and criminal cases.  See e.g., Chavers
v. State, 991 S.W.2d 457, 460-61 (Tex.App.--Houston
[1st Dist.] 1999, pet. ref=d);
Trailways, Inc. v. Clark, 794 S.W.2d 479, 483 (Tex.App.--Corpus Christi 1990, writ denied); Rogers v.
Gonzales, 654 S.W.2d 509, 512 (Tex.App.--Corpus
Christi 1983, writ ref=d
n.r.e.); Bates v. Barclay, 484 S.W.2d 955,
957-59 (Tex.Civ.App.--Beaumont 1972, writ ref=d n.r.e.); Adams
v. Smith, 479 S.W.2d 390, 395 (Tex.Civ.App.--Amarillo
1972, no writ); Beynon v. Cutberth, 390 S.W.2d 352, 355-56 (Tex.Civ.App.--Eastland
1965, no writ).  With the exception of Chavers, these decisions pre-date Daubert and Kelly, and there is no
determination in any of the cases that the formulas used to calculate speed are
scientifically reliable.  Although Chavers employs the proper criteria under Kelly,
the decision is distinguishable because the expert witness based his
calculations on yaw marks rather than the two formulas used by Cisneros.  Therefore, taking judicial notice of Chavers is of no benefit in the instant case.








In Thomson v.
Rook, a United States District Court conducted a Daubert
hearing to determine the admissibility of an accident reconstruction expert=s opinion regarding speed, distance
traveled by vehicles, and the point of impact of the collision.  Thomson v. Rook, 255
F.Supp.2d 584, 584-87 (E.D.Tex. 2001).  That court determined that the articles,
books, and other experts in the accident reconstruction field validated the
methodology used by the expert witness for calculating speed, distance traveled
by the vehicles, and the point of impact. 
Id. at 586.  In a footnote, the court noted that the
expert witness calculated speed using a Astandard
physics equation employed by automobile accident reconstruction experts and a
coefficient of friction derived from J. Stannard
Baker=s book, Traffic
Investigation Manual.@  Id. at 586 n.5.  The witness calculated speed and distance
traveled by one of the vehicles using a standard rate of acceleration from a
standard start as reported by the Baker book. 
Id.  The district court
admitted the witness=s
expert opinion on these topics but excluded the witness=s
opinion about the driver=s
braking time because the plaintiffs had not produced evidence or articles or
books, or other experts that validate the methodology used by the expert
witness.  Id. at
587.  It is impossible to
determine whether Cisneros used some of the same formulas as the witness in Thomson,
and therefore, taking judicial notice of this decision would not benefit the
State.

I have been unable
to find any Texas appellate decisions at the state or federal level holding
that the skid speed formula and linear momentum formulas utilized by Cisneros
are reliable.








A cursory review
of appellate decisions from other jurisdictions indicates that this type of
expert testimony has been often admitted into evidence in other states.  See e.g., State v. Russo, 450 A.2d
857, 866-67 (Conn.Super.Ct. 1982)(holding that an
expert in Connecticut may testify as to the speed of a motor vehicle based on
skid marks and other factors because the formulas used to calculate speed are
based on well-recognized principles of physics that have gained general
acceptance in the field of accident reconstruction); Bryant v. Buerman, 739 So.2d 710, 712-13 (Fla.Dist.Ct.App.
1999)(holding that opinion of an accident reconstruction expert witness
regarding the speed of a vehicle at the time of an accident is admissible in
personal injury action arising out of collision, so long as the expert=s testimony is helpful to the
jury).  See also Jerre E. Box, Annotation, Opinion Testimony as to Speed
of Motor Vehicle Based on Skid Marks and Other Facts, 29 A.L.R. 3d '' 248-77 (1970 & Supp.
1996)(discussing numerous decisions admitting and excluding this type of
evidence).  As is the case with the Texas
decisions discussed above, many of the out-of-state decisions pre-date Daubert and Kelly, and of those cases decided
since Daubert and Kelly, the opinions
do not discuss reliability of the same formulas used by Cisneros.  Further, none of these decisions indicates
that the formulas utilized by Cisneros have become so widely accepted or
persuasively proven that future courts may take judicial notice of their
reliability.  See Hernandez, 116
S.W.3d at 29 n.6. 
The Connecticut Supreme Court stated in Russo that using the
coefficient of friction to estimate speed is a well recognized principle that
has gained general acceptance in the field of accident reconstruction.  Russo, 450 A.2d at
866.  While Cisneros utilized the
coefficient of friction in the skid speed formula to determine 

post-impact
speed, he used a different formula to obtain pre-impact speed and that is the
object of Appellant=s
complaint on appeal.  Moreover, the Court
of Criminal Appeals cautioned in Hernandez about reliance on judicial
opinions from non-Texas jurisdictions because many other jurisdictions utilize
the Apreponderance
of the evidence@ standard
rather than the Aclear and
convincing@ evidence
standard required in Texas.  Hernandez,
116 S.W.3d at 31 n.13.








In the absence of
any evidence showing the reliability of the speed calculation formulas utilized
by Cisneros, the trial court erred in admitting Cisneros=
conclusion that Appellant=s
vehicle was traveling 104 miles per hour at the point of impact.  However, I would also find the error harmless
as stated in the majority opinion.  With
these additional comments and observations, I concur in the judgment affirming
the trial court=s
judgment.

 

 

 

January 29, 2004

ANN CRAWFORD McCLURE,
Justice











[1]
In his sole issue, Appellant does not challenge Officer Cisneros= testimony concerning the Corvette=s speed on relevancy grounds.  Therefore, we will address its reliability
only.  





[2]
The first count of intoxication manslaughter in the indictment alleged
Appellant:

 

[D]id then and there, by accident or
mistake, while operating a motor vehicle in a public place while intoxicated,
to wit:  by having an alcohol
concentration of .08 or more, and by reason of that intoxication caused the
death of MARIO SANDOVAL by then and there driving said motor vehicle into and
causing it to collide with a motor vehicle in which MARIO SANDOVAL was a
passenger . . . .

 

The second count of intoxication manslaughter alleged
Appellant:

 

[D]id then and there, by accident or mistake, while operating
a motor vehicle in a public place while intoxicated, to wit:  by having an alcohol concentration of .08 or
more, and by reason of that intoxication caused the death of ROBERT SANDOVAL by
then and there driving said motor vehicle into and causing it to collide with a
motor vehicle driven by ROBERT SANDOVAL . . . .





[1] Cisneros= written report was not admitted into
evidence.





[2] Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct.
2786, 125 L.Ed.2d 469 (1993).