Opinion filed March 31, 2014



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00090-CR

_____

## WILLIAM EARL STIRMAN, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 238th District Court**

**Midland County, Texas**

**Trial Court Cause No. CR38912**

## MEMORANDUM OPINION

The jury convicted William Earl Stirman of first-degree felony murder and assessed his punishment at confinement for fifty years. The trial court sentenced him accordingly. We affirm.

Appellant's conviction for murder was the result of a tragic incident involving Appellant's eighteen-year-old son, William Eric Stirman. Appellant

claimed that Eric came toward him with a knife and that he shot Eric in self-defense. On appeal, Appellant contends that the trial court erred when it admitted expert testimony regarding blood spatter, gunpowder stippling, and the positioning of the knife and Eric's body. Appellant also argues that the trial court erred when it excluded testimony that Eric had threatened to kill him in the past.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). We will reverse a trial court's ruling only if it is outside the "zone of reasonable disagreement." *Id.* We will uphold a trial court's decision if that decision is correct on any theory of law applicable to the case. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

In his first issue, Appellant asserts that the trial court erred when it allowed Investigator Beau Estes, David Newman, and Dr. Nizam Peerwani to testify as experts because they testified outside of their areas of expertise and rendered opinions based on insufficient predicate. Appellant argues that neither Investigator Estes nor Newman was qualified to render an opinion regarding the neurological and neuromuscular effects of a gunshot wound on the human body or the mechanics of that body subsequently falling while holding a knife because, according to Appellant, neither was an expert in medicine, neurology, anatomy, physics, engineering, or biomechanics. Appellant also argues that the State failed to show that Investigator Estes's or Newman's testimony was reliable. In addition, Appellant asserts that Investigator Estes, Newman, and Dr. Peerwani were all permitted to testify regarding blood spatter evidence without proving that the material they were analyzing was actually Eric's blood.

Rule 702 of the Texas Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. Before a trial court admits expert testimony, it must be satisfied that the following three conditions are met: (1) the witness qualifies as an expert because of his knowledge, skill, experience, training, or education regarding the subject matter; (2) the subject matter of the testimony is appropriate for expert testimony; and (3) the expert testimony will actually assist the factfinder in deciding the case. *Alvarado v. State*, 912 S.W.2d 199, 215–16 (Tex. Crim. App. 1995). The three conditions are commonly referred to as qualification, reliability, and relevance. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006).

Appellant does not challenge the relevancy of the three experts' testimony. In addition, Appellant did not object to the reliability of Newman's testimony at trial, nor did Appellant object that Newman or Dr. Peerwani failed to show that the material that they were analyzing was Eric's blood when they testified regarding blood spatter found at the scene. Therefore, Appellant has failed to preserve error regarding the reliability of Newman's testimony and regarding whether Newman and Dr. Peerwani were allowed to render opinions based on insufficient predicate. *See* TEX. R. APP. P. 33.1. Appellant did object that Investigator Estes was not qualified to testify as an expert, that the State failed to show that Estes's testimony was reliable, and that the State failed to prove that the material Estes was analyzing was Eric's blood. Appellant also objected that Newman was not qualified to testify as an expert. We will address this contention first.

Newman testified that he was the owner and consultant of "Inside the Tape," a training program that he created in 2002 for law enforcement agencies, detectives, prosecutors, pathologists, coroners, and other professionals that investigate suspicious deaths. He conducts training seminars for law enforcement agencies, reviews cold cases, and does "911 analysis" around the country.

3

Newman was a police officer for twenty-two years and served as a detective for fifteen of those years. He holds an undergraduate degree in criminal justice. He has participated in over 1,000 crime scene investigations, 175 of which were homicide investigations. During his career as a detective, he received over 120 hours of specialized training in advanced forensics regarding crime scene management; bloodstain patterns; patterns of gunshot powder residue, such as stippling; medical legal training, including time, cause, and manner of death; and crime scene reconstruction, such as the positioning of items found at a crime scene and the reconstruction of witnesses' observations of the incident. Newman testified that these fields of forensic discipline are recognized in the forensic community as valid scientific fields and are commonly used throughout the United States. He teaches these disciplines in multiple venues around the country, including a certified class in Texas in which participants receive course credit.

Newman has also been trained through medical legal experience and investigation on how the human body reacts and how far the human body can actually go after receiving a certain type of trauma. He has worked with medical examiners to determine what the body's reaction would be after suffering from a particular injury. In addition to his training and experience, Newman has personally seen two different people suffer gunshot wounds to the head. In each of those instances, the person came to a complete stop. Newman has testified countless times and for hundreds of hours as an expert on forensic disciplines that incorporate crime scene analysis and crime scene reconstruction.

When the State offered Newman as an expert on homicide investigations and its related forensic applications, including blood spatter; gun muzzle distance and residue; crime scene analysis; and crime scene reconstruction, defense counsel objected that Newman was not qualified under Rule 702 because the State did not establish how many times Newman had testified as an expert, where he had

4

testified as an expert, or in what courts he had testified as an expert. The trial court overruled Appellant's objection and allowed Newman to testify as an expert. On appeal, Appellant complains that Newman was not qualified to render an opinion regarding the neurological and neuromuscular effects of a gunshot wound on the human body or the mechanics of that body subsequently falling while holding a knife because he was not an expert in medicine, neurology, anatomy, physics, engineering, or biomechanics. Appellant's argument on appeal does not comport with his argument that he raised at the trial court; thus, Appellant has failed to preserve error for our review. *See* TEX. R. APP. P. 33.1; *Pena v. State*, 285 S.W.3d 459, 463–64 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial.").

Even if Appellant had preserved error, we cannot say that the trial court abused its discretion when it found that Newman was qualified to render an opinion on how a body reacts to a gunshot wound to the head. "Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006). Although the State did not specifically offer Newman as an expert on the neurological and neuromuscular effects of a gunshot wound to the human body, the State did offer Newman as an expert on homicide investigations, including crime scene reconstruction. Newman testified that the forensic discipline of crime scene reconstruction encompassed the positioning of physical evidence found at the crime scene. He testified that he had been trained through medical legal experience and investigation on how the human body reacts to certain types of trauma and that, in his personal experience, he had witnessed two people suffer from gunshot wounds to the head and personally

watched how their bodies reacted. He also testified that he taught classes on crime scene analysis and reconstruction throughout the country, including Texas, and had testified as an expert regarding forensic disciplines on numerous occasions. Therefore, we cannot say that the trial court acted outside the "zone of reasonable disagreement" when it recognized Newman as an expert and allowed him to render an opinion as to how a body reacts to a gunshot wound to the head.

We will next address Appellant's argument that the State failed to show that Investigator Estes's testimony was reliable. Evidence derived from a scientific theory must satisfy three criteria to be considered reliable: (1) the underlying scientific theory must be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). The proponent of the evidence has the burden to show, by clear and convincing evidence, that the evidence is reliable. *Id.* When Appellant objected that the State had failed to show that the underlying theories of latent fingerprints, crime scene reconstruction, or blood spatter analysis were reliable and that the techniques applying such theories were reliable, the State responded that Investigator Estes was not going to testify that he conducted any scientific tests but that his testimony was based on theories of crime scene investigation, on his extensive knowledge in law enforcement, and on the many crime scenes he had investigated. The State did not offer any explanation as to the reliability of Investigator Estes's testimony.

Although a court may take judicial notice that a scientific theory and the technique applying that theory have been found reliable, the record must contain some showing that the theory has been held reliable in the past, such as cites to scientific materials or judicial opinions that support the validity of the theory. *Hernandez v. State*, 116 S.W.3d 26, 29–30 (Tex. Crim. App. 2003). "[J]udicial notice on appeal cannot serve as the sole source of support for a bare trial court

6

record concerning scientific reliability." *Id.* at 31–32. The only evidence in the record that touched on whether the evidence was reliable was Investigator Estes's testimony that bloodstain pattern analysis, latent fingerprints, and crime scene analysis and reconstruction were legitimate areas of expertise in the field of crime scene investigation. However, this evidence fails to show, by clear and convincing evidence, that the scientific theories relied on by Investigator Estes were reliable or had been found to be reliable in the past. The State failed to offer any cites to any scientific materials or judicial opinions or any argument that the underlying theories of latent fingerprints, crime scene reconstruction, and blood spatter analysis were reliable. Thus, because the State failed to meet its burden to show that the scientific theories and methodologies relied upon by Investigator Estes were reliable, the trial court erred when it permitted Investigator Estes to testify as an expert. In light of our holding, it is not necessary for us to determine whether Investigator Estes was qualified to testify as an expert on latent fingerprint identification, crime scene analysis and reconstruction, and blood spatter analysis or to determine whether the trial court erred when it allowed Investigator Estes to testify without requiring the State to prove that the matter he was analyzing was Eric's blood. *See* TEX. R. APP. P. 47.1.

Having determined that the trial court erred, we must now determine whether the error is reversible under TEX. R. APP. P. 44.2(b), which applies to nonconstitutional errors. Pursuant to Rule 44.2(b), an error is not reversible error unless it affects a substantial right of the defendant. A substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). An accused's substantial rights are not affected by the erroneous admission of evidence if the court, after examining the record as a whole, has fair assurance that the error did not influence

the jury or had but a slight effect. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). The improper admission of evidence is harmless when the same facts are proven by other properly admitted evidence or evidence that is admitted without objection. *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999); *Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986).

Here, the combination of Newman's and Dr. Peerwani's testimony established the same underlying facts and opinions as Investigator Estes's testimony. Investigator Estes and Newman opined that Appellant's version of events was inconsistent with the physical evidence found at the scene. They testified that the knife found at the crime scene had to have been moved by someone other than Eric after Eric was shot in the head and fell to the ground. They testified that, when a person is shot in the head, the person is going to collapse where he is standing and that his body will fall backward. The person's body will move little, if any, after suffering from such a shot. They testified that, if Eric was holding a knife when Appellant shot him, the knife should have fallen and landed at Eric's feet, definitely not above his waist. Here, the knife was found near Eric's head. Eric's hands were down by his waist. Investigator Estes and Newman also testified that the knife had blood on both sides and unless there was already blood on the carpet prior to the knife hitting the carpet, the blood could not be on both sides of the knife. They also explained that a blood smear on the handle of the knife indicated that someone had to have touched the knife after Eric fell to the ground. Thus, the positioning of the knife did not support Appellant's statement that Eric had a knife in his hand when Appellant shot Eric in self-defense

Investigator Estes and Newman also opined that Eric could not have been coming around the side of the bed and toward Appellant when Appellant shot him because, if Eric's body had been moving forward, then his body would have fallen forward when he was shot. Instead, his body fell backward indicating that Eric

8

was standing still when he was shot. Dr. Peerwani also testified that the body falls where the center of gravity is; if a person is standing still, the body will probably fall backward, whereas if a person is moving forward, the body will fall forward.

Investigator Estes also opined that Appellant could not have been standing in the doorway of the bedroom when he fired the shot because of the blood spatter found on the gun and the casing found on the bed. Investigator Estes testified that the distance from the doorway to the corner of the bed where Eric was standing was approximately eight feet and that blood will only spatter about one to one and one-half feet back from a wound caused by a .22 caliber pistol. Dr. Peerwani testified that back spatter from such a wound does not occur beyond thirty inches, at the very most, but estimated that the range in this case was probably no greater than twenty inches; it would be impossible for Appellant to be six to ten feet away from Eric when he fired the shot.

The only opinion that Investigator Estes gave that neither Newman nor Dr. Peerwani gave was that it was not likely that the casing found on the bed could have come from a weapon that was fired in the doorway of the bedroom. He explained that it was likely that the weapon was fired from somewhere "in the vicinity of about halfway through the bed." Dr. Peerwani did testify, as discussed above, that Appellant could not have been six to ten feet away when he shot the gun due to the back spatter of blood on the gun. Newman and Dr. Peerwani also testified that there was stippling on Eric's forehead and that the stippling indicated that Eric was shot at a very close range. Each explained that stippling does not occur beyond thirty inches. Due to the stippling, Newman also agreed it would be impossible for Appellant to have been six to ten feet away when he shot Eric. Dr. Peerwani also testified that the bullet entered the brain in a downward trajectory and that the evidence was consistent with a person doing something like rustling papers, looking up, and being shot in the head. Thus, the opinion that

9

Appellant could not have been standing in the doorway of the bedroom when he fired the shot was also given by Newman and Dr. Peerwani despite the fact that neither Newman nor Dr. Peerwani testified to the implication of the casing being found on the bed.

Because the underlying facts and opinions of Investigator Estes's testimony were also established by the testimony of Newman and Dr. Peerwani, we hold that the trial court's error in admitting Investigator Estes as an expert, when the State failed to show that his testimony was reliable, was harmless. *See* TEX. R. APP. P. 44.2(b); *Brooks*, 990 S.W.2d at 287; *Anderson*, 717 S.W.2d at 628. We overrule Appellant's first issue.

In his second issue, Appellant contends that the trial court abused its discretion when it excluded Gary Shannon Lane's testimony regarding an incident that occurred two years prior to the night in question in which Eric said he was going to kill Appellant.

In a bill of exception, Lane testified that Appellant's wife called him and told him that Eric was sitting on the front porch with a shotgun waiting for Appellant to come home and that he was going to kill Appellant. Lane drove to Appellant's home and found Eric on the front porch with a shotgun across his lap. Eric told him that he intended to kill Appellant when he saw him. Defense counsel argued that he was offering Lane's testimony to show the relationship between Appellant and Eric as permitted under TEX. CODE CRIM. PROC. ANN. art. 38.36 (West 2005). Defense counsel also argued that Lane's testimony fell under three exceptions to the hearsay rule: present sense impression; then existing mental, emotional, or physical condition; and statement against interest. *See* TEX. R. EVID. 803(1), (3), and (24). The trial court excluded the testimony. On appeal, Appellant contends that the statement was an exception to the hearsay rule under

the same three exceptions that he argued at trial. We agree that the statement Eric made to Lane fell under the "state of mind" exception to the hearsay rule.

Rule 803(3) provides that "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health)" is not excluded by the hearsay rule. TEX. R. EVID. 803(3). The State argues that because the statement was made two years before Appellant shot Eric, the statement does not show that Eric actually formed a plan to kill his father or still had that intention on the night that he was shot and, therefore, the statement was not relevant. We disagree with the State's contentions.

Article 38.36 provides that, "[i]n all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased." CRIM. PROC. art. 38.36. In addition, when a defendant in a murder prosecution raises the issue of self-defense, he may introduce evidence of the deceased's violent character. TEX. R. EVID. 404(a)(2); *Torres v. State*, 117 S.W.3d 891, 894 (Tex. Crim. App. 2003). Specific acts of violence may be introduced to show that the deceased was the first aggressor even when the defendant was unaware of the specific act. *Torres*, 117 S.W.3d at 894. The Court of Criminal Appeals has held that such evidence is relevant apart from showing character conformity because it demonstrates the deceased's intent, motive, or state of mind. *Id.* at 894–95. Thus, Lane's testimony that Eric had a shotgun in his lap and told Lane that he intended to shoot Appellant when he saw him was a specific act of violence that was relevant to show that Eric may have been the first aggressor on the night in question. The fact that the incident occurred two years prior to the night in question did not render the evidence

11

irrelevant, but was a factor that the jury could have considered in determining the weight to be given to the evidence.

In addition, the proper predicate was laid at the time Appellant made his bill of exception. Before a defendant can offer evidence of a prior specific act of violence committed by the deceased, there must be some evidence in the record that the deceased was acting aggressively during the events that gave rise to the murder charge. *Id.* at 895. Here, the State had introduced Appellant's statement that he made to the police shortly after the incident. In his statement, Appellant claimed that Eric threatened to kill him multiple times on the night in question and that he came toward Appellant with a knife. Therefore, there was evidence in the record that Eric was acting aggressively on the night in question. Because the statement that Eric made to Lane fell under the "state of mind" exception to the hearsay rules and because it was relevant for the reasons we have discussed above, the trial court erred when it excluded Lane's testimony.

Having found that the trial court erred, we must now determine whether that error was harmful. Appellant argues that the exclusion of Eric's statement to Lane crippled his ability to fully present his case for self-defense and, thus, violated his rights under the Sixth Amendment of the United States Constitution and Article 1, Section 10 of the Texas Constitution. Defense counsel made this same argument at trial and also argued that it was crucial to have Lane's testimony before the jury because the evidence showed that Eric had threatened to kill Appellant in the past and tended to show that it was likely that Eric threatened to kill Appellant on the night in question. While we agree that the excluded evidence went toward Appellant's claim of self-defense, we do not agree that the error precluded Appellant from presenting his defense.

Not only did the State introduce Appellant's statement into evidence, but Appellant testified as to the events of the night in question. Appellant testified that

he, his wife, his daughter, his brother, and Eric went to Paul and Lori Rose's house for dinner. Paul was Appellant's ex-brother-in-law. After dinner, everyone that was at the Roses' house went to another house down the street for a Fourth of July party. They all returned to the Roses' home and sometime later in the night, Appellant's wife alerted Appellant that there might be a problem with Eric. Appellant went outside to talk to Eric. Eric was "shooting hoops," and Appellant asked him to come over to him. Appellant testified that Eric was wobbling and was not walking straight. He asked him what he was doing, what was wrong with him, and whether he was on drugs. Appellant stated that Eric's face was not right. When Eric got to him, Eric put his forehead on Appellant's forehead, put his hands on Appellant's shoulders, and said, "Don't f---ing worry about it." Appellant told Eric to take his hands off him, and Eric hit him. Before Appellant could get Eric to the ground, Eric had hit him three or four more times. Appellant's brother, Frank Stirman, grabbed Eric, and Appellant began looking for his glasses that had fallen on the ground during the fight. While Appellant was looking for his glasses, he heard Frank and Eric arguing. Eric got away from Frank and yelled, "I'm gonna kill you." Appellant assumed that Eric was talking to him.

Eric phoned Appellant while Appellant was still at the Roses' house and told Appellant that he was going to kill him, that he was going to cut his head off, and that he was going to burn his house down. Appellant testified that Eric sounded very agitated and that he could hear other voices in the background.

Appellant, Appellant's wife, and Frank went back to Appellant's house. Appellant got a .22 caliber pistol from his gun safe. Frank eventually left, and Appellant's wife went to bed. Appellant was in the restroom when he heard someone beating on the front door. He grabbed the pistol and stuck it in his back waistband. Appellant went to the front door. Eric was beating very loudly on the door; he was "[w]ild-eyed"; and his hair was in disarray. Appellant opened the

13

door.  Eric had his arms above his head with his elbows locked in the doorframe. Eric pushed the door open, and Appellant saw that he had a knife.  The knife was open with the handle pointing back toward Eric's arm.  Although Appellant was scared of Eric when he opened the door, he thought that he could talk to Eric and that they could reconcile whatever it was that was going on between them.

Eric told Appellant that he was there to get his stuff and get out.  Appellant told Eric that he was going to call Eric's probation officer in the morning, and Eric responded, "Whatever.  I hate you.  I'm gonna kill you."  Eric shut the front door and went down the hall toward his room.  Appellant followed him.  Eric began packing a bag of clothes, and Appellant asked him what was wrong.  Eric continued to say that he hated Appellant and that he was going to kill him.  Eric was acting aggressively and hatefully toward Appellant.  Appellant stepped toward the dresser in Eric's bedroom to get Eric's probation papers and again told Eric that he was going to call Eric's probation officer.  Eric stepped toward Appellant with the knife, and Appellant shot him.  Appellant testified that he was terrified and scared when he saw the knife go up and that he did not feel like he had an alternative to protect himself when he fired his gun.  He had neither provoked nor physically threatened Eric.  Appellant believed that what he did was necessary to protect himself.

Appellant testified that he was probably standing three to four feet away from Eric when he shot the gun.  He explained that his statement to the police— that he was standing in the doorway of the bedroom when he fired the gun—was incorrect because, when he spoke to the police shortly after the incident, he forgot that he had stepped inside the room to get the probation papers.  Appellant also explained that, the last time he saw Eric, Eric's arm was up by his head; there was a thin trail of blood going back through his hair; there was no vomit on his face; and there was no blood on his forehead.

14

Appellant's statement to police shortly after the incident was substantially similar to Appellant's testimony at trial except for the discrepancy reading where Appellant was standing when he fired the shot, as we discussed above.

In addition, Frank also testified to the events of the night in question. Frank testified that, while they were at the Roses' house, he was alerted that there was a problem in the backyard and saw Eric hit Appellant. Appellant restrained Eric, and Frank grabbed Eric. Eric swung at Frank before he was able to restrain Eric. While Frank had Eric restrained, Frank asked him what was going on. Eric told him that he had taken some pills. Frank let go of Eric "a little bit," and Eric escaped from Frank's hold. Eric ran to the backyard fence, and before he jumped it, he said, "I'm gonna kill you." Frank did not know whether Eric meant that he was going to kill him or Appellant.

After Eric left, Frank and the other people at the Roses' house sat around the table on the back porch to calm down. While still at the Roses' home, Appellant received a phone call from Eric. Frank went to Appellant's house with him and stayed for twenty to thirty minutes. He eventually decided to go home because he thought that Eric must have gone to stay with one of his friends. When Frank left Appellant's house, Appellant was "nice and calm."

Through Appellant's own testimony, the testimony of his brother, and his statement that he made to police shortly after the incident, Appellant was able to present his claim of self-defense. Therefore, we cannot say that the trial court's exclusion of Eric's prior threat against Appellant was a constitutional error and, thus, will review the error under the nonconstitutional harm analysis as set out above. *Potier v. State*, 68 S.W.3d 657, 666 (Tex. Crim. App. 2002) (holding that trial court's error in excluding evidence relevant to the defense of self-defense was not an error of constitutional dimension because the exclusion of the evidence did not prevent defendant from presenting a defense).

The character of both Eric and Appellant, the events leading up to the fatal shot, and the circumstances surrounding the fatal shot were contested throughout the trial. Several of the State's witnesses testified that Eric was a loving, caring, and nonviolent person and that Appellant treated Eric very poorly and was physically violent toward Eric. Lane testified that Eric was a violent person and was disrespectful to Appellant. Lane also testified that Eric became belligerent when he drank. Lane explained that Eric would throw things, that he became threatening, and that he would elevate his voice. The evidence was undisputed that Eric had been drinking on the night in question. The evidence was also undisputed that Eric smoked marihuana and was on felony probation for criminal mischief. In his statement to police shortly after the incident, Appellant said that Eric had tested positive for marihuana two days prior to the incident, that sometime in the past Appellant had found a white powder in the house, and that several years prior Eric had stolen OxyContin from Appellant's father and brother. Although Lane was not permitted to testify that Eric had threatened to kill Appellant two years prior to the charged offense, Lane was allowed to tell the jury that, because of a phone call that he received, he went to Eric's home, took a loaded shotgun away from Eric, and took Eric back to his house.

As to the events leading up to the fatal shot, Matthew, Paul Rose's son, testified that Appellant started the fight between Appellant and Eric at the Roses' house. Both Matthew and Paul testified that they never heard Eric threaten Appellant. Paul testified that he heard Eric yelling but could not understand what he was saying. Paul also testified that, when Appellant left the Roses' house, he was agitated and angry, whereas Frank testified that Appellant was "nice and calm." The neighbors who lived across the street from Appellant testified that Eric came to their house before he went home to get clothes. When Eric left their house, he did not have a knife in his hand, nor did he have a knife in his hand when

he went in the front door of his home. One neighbor testified that he did not hear Eric yelling or threatening anyone and that Eric did not make any threats at the neighbor's house.

As we discussed in length above, Appellant presented evidence that, on the night in question, Eric threatened to kill him and was acting differently than he had ever acted. Appellant testified that Eric had threatened him in the past as well. Appellant claimed that Eric came toward him with a knife and that he shot Eric in self-defense. He explained that Eric's hand was above his head the last time that he saw Eric and that he had actually shot Eric at a much closer range than he originally told police. This explanation was in rebuttal of the opinions of the State's forensic experts.

Although the evidence at trial was contested and although the jury was not permitted to hear Eric's previous statement to Lane that he intended to kill Appellant when he saw him, the jury was able to hear that Eric threatened to kill Appellant on the night in question, that Eric became violent when he drank, and that Eric was inebriated that night. The jury was also able to hear Appellant's explanation of how his version of events was consistent with the physical evidence found at the crime scene. Based on our review of the record, and taking into consideration that Eric made the statement to Lane two years prior to the night in question, we have a fair assurance that the trial court's exclusion of Eric's statement to Lane did not influence the jury or had but a slight effect. *See Johnson*, 967 S.W.2d at 417. We overrule Appellant's second issue.

We affirm the judgment of the trial court.

JIM R. WRIGHT

CHIEF JUSTICE

March 31, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.